UNITED STATES v. CHICAGO, ST. P., M. & O. RY. CO. et al. SAME v. GREAT NORTHERN RY. CO. et al. (four cases). SAME v. WISCONSIN CENT. RY. CO. et al. SAME v. MINNEAPOLIS & ST. L. R. CO. et al. SAME v. AMES-BROOKS CO. SAME v. DULUTH-SUPERIOR MILLING CO. SAME v. McCAULL-DINSMORE CO.

(District Court, D. Minnesota, Fourth Division. January 26, 1907.)

Nos. 3,616-3,625.

1. CARRIERS—INTERSTATE COMMERCE—INDICTMENT FOR GIVING REBATES.

In an indictment based on section 1 of the Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]), charging an interstate carrier with the giving of rebates, where it is averred that defendant received the legal rate, and granted and paid to the shipper a certain rebate or concession, whereby it transported the property shipped at less than the legal rate, it is not necessary to allege a prior agreement for such rebate, nor need the indictment negative the existence of conditions or circumstances which might render the payment legal; that being a matter of defense.

2. STATUTES—EFFECT OF REPEAL OF PENAL STATUTE—STATUTORY RULE OF CONSTRUCTION.

Rev. St. § 13 [U. S. Comp. St. 1901, p. 6], which provides that "the repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability," was not an attempt to limit the power of succeeding Congresses; but it merely prescribes a rule of construction, binding upon the courts, as a substitute for the common-law rule with respect to the effect of a repealing statute as a release from penalties and prosecutions for offenses committed under the statute repealed, and under it the repeal of a penal statute extinguishes no penalties previously incurred thereunder, in the absence of an express extinguishing clause in the repealing act.

3. CARRIERS—ACT REGULATING INTERSTATE CARRIERS—EFFECT OF REPEAL OF PRIOR STATUTES.

Section 10 of the Hepburn act (Act June 29, 1906, c. 3591, 34 Stat. 595), relating to rates of interstate carriers, which provides that "all laws and parts of laws in conflict with the provisions of this act are hereby repealed, but the amendments herein provided for shall not affect causes now pending in courts of the United States, but such causes shall be prosecuted to a conclusion in the manner heretofore provided by law," when construed in accordance with the rule prescribed by Rev. St. § 13 [U. S. Comp. St. 1901, p. 6], does not relieve offenders under section 1 of the Elkins Act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]), from subsequent indictment and prosecution for such offenses, but merely relates to the mode of procedure to be followed in pending causes.

At Law. The above-entitled actions came on to be heard, at Minneapolis, in said district, on the 13th day of December, 1906, on the demurrers heretofore filed by the defendants to the indictments therein.

Charles C. Houpt, Paul A. Ewert, and J. M. Dickey, for the United States.

Thomas Wilson, for defendants Chicago, St. P., M. & O. Ry. Co. and others.

C. A. Severance, for defendants Ames-Brooks Co. and others

Wm. R. Begg, for defendants Great Northern Ry. Co. and others.

George R. Seavers, for defendants Minneapolis & St. L. Ry. Co. and others.

Walter D. Corrigan, for defendants Wisconsin Cent. Ry. Co. and others.

MORRIS, District Judge. The first ground on which the demurrers in these cases are rested is that the indictments do not charge a violation of the statutes in force at the date of the doing of the illegal acts. The particular allegations to which attention is directed are as follows:

"That on the 26th day of December, 1905, the said Spencer Grain Company did deliver * * * one car load of oats * * * consigned to Cargill Commission Company, Duluth, Minnesota, to the said common carrier aforesaid (the defendant railway company), at said city of Minneapolis, for transportation by said common carrier * * * by interstate commerce to said city of Duluth, and the said common carrier did immediately upon and in pursuance of such delivery of said property so transport the same by interstate commerce over its said route, or the line of railway hereinbefore mentioned, running from the said city of Minneapolis to the said city of Duluth, * * * and the said Spencer Grain Company did thereupon pay to the said common carrier, and the said common carrier did receive from said Spencer Grain Company, the freight rates and charges for the transportation of said property set forth in the tariffs and schedules then showing the legal rates and charges established by said common carrier for such services then in force and effect upon its said route, to wit, five cents per each one hundred pounds, * * * and that the said Chicago, St. Paul, Minneapolis & Omaha Railway Company, the said H. M. Pearce, E. B. Ober, and F. C. Gifford, officers and agents of the said Chicago, St. Paul, Minneapolis & Omaha Railway Company as aforesaid, did on the 15th day of February, A. D. 1906, * * * willfully and unlawfully grant and pay to the said Spencer Grain Company, a corporation, as aforesaid, certain rebates of the said freight rates and charges so paid as aforesaid and certain concessions in respect to the said transportation of said property, whereby the said property was by said corporation common carrier transported in said interstate commerce from the said city of Minneapolis to the said city of Duluth * * * at a less compensation and rate than that named therefor in the said tariffs and schedules; that is to say, a rebate, refund, and concession of one-half cent per bushel on each bushel of said oats."

The contention, if I understand it, is this: That, if the full amount of the legal schedule rate was in form paid and received as a cover or fraudulent device pursuant to a prearrangement or understanding that less than the legal tariff rate should be in fact paid and accepted for the services rendered, it should have been so charged in the indictment. The argument proceeds upon the assumption that the indictment was based upon sections 2, 3, and 6 (particularly section 6), of "An act to regulate commerce," approved February 4, 1887 (24 Stat. 379, 380, c. 104 [U. S. Comp. St. 1901, pp. 3155, 3156]), and the acts amendatory thereof prior to the passage of the act of June 29, 1906, commonly known as the "Hepburn Act" (Act June 29, 1906, c. 3591, 34 Stat. 584). It is sufficient to say, in answer to this, that the indictment is not based upon said sections, but is based upon the first section of the "Act to further regulate commerce with foreign nations and among the states," approved February 19, 1903, commonly known as the "Elkins Act" (which I shall hereafter fully set forth so far as may be necessary in the consideration of this case), and that under said section of the latter act no such allegation is necessary.

The argument further proceeds, as I understand it, upon the theory that if it were conceded that the defendant, without any prearrangement or understanding, express or implied, at some time after the service was performed and paid for, refunded to a shipper a sum equal to a given per cent. of the tariff before paid, that would not necessarily be a violation of any federal statute, because, if the defendant railway company, on account of certain conditions or circumstances, found it necessary, in order to compete with a rival company and to build up a through business over its line and the Great Lakes to the East, to pay the cost of transferring such grain, after it had been transported over its line, through an elevator to the vessels, or what would be on principle the same, having an elevator of its own, to pass the grain through it without charge, by first receiving the rates .and charges set forth in the published tariffs and schedules, and afterwards refunding to the shipper the cost of such transfer, or if, in order to compete with a rival company, it offered and gave to the shipper of such grain storage free in its elevator while awaiting shipment, or for such grain it furnished side tracks and the use of its cars, without charging demurrage, while awaiting shipment, by first receiving the published rates and charges and afterwards refunding to the shipper the cost of such storage or demurrage, hoping thus to build up such a traffic over its line, that would not be illegal.

It is sufficient to say, in answer to this contention, that even if such conditions or circumstances, if they actually existed, might be shown in defense (which I extremely doubt, but which I do not think it necessary now to decide), it was not necessary under the Elkins act, in addition to the allegation that the defendant did on the 15th day of February, 1906, willfully and unlawfully grant and pay certain rebates and concessions in respect to the transportation of the grain, whereby the said grain was transported in interstate commerce from the city of Minneapolis to the city of Duluth at a less compensation and rate than that named therefor in the published tariffs and schedules, to make any allegation negativing the existence of such conditions or circumstances. It seems to me, therefore, that this ground of demurrer is not well taken.

The second ground on which the demurrers are based is that. since the passage of the act entitled "An act to amend an act entitled 'An act to regulate commerce,' approved February 4, 1887, and all acts amendatory thereof, and to enlarge the powers of the Interstate Commerce· Commission," approved June 29, 1906 (Acts First Sess. 59th Cong. 1905–06, pt. 1, p. 584, c. 3591), commonly known as the "Hepburn Law," and which I shall hereafter for the sake of brevity refer to as the "Hepburn Law," there can be no prosecutions under the first section of the law commonly known as the "Elkins Law" (Act Feb. 19, 1903, c. 708, 32 Stat. pt. 1, p. 847 [U. S. Comp. St. Supp. 1905, p. 599]), and which I shall hereafter, for the sake of brevity, refer to as the "Elkins Law," for violations of said law except in cases where the prosecutions were pending at the time of the passage of the Hepburn law; in other words, that only those offenders against the first section of the Elkins law against whom causes were pending at the time·

of the passage of the Hepburn law can now be prosecuted. Section 1 of the Elkins law, in so far as it is necessary to consider it here, provides as follows:

" * * * It shall be unlawful for any person, persons, or corporation to offer, grant, or give or to solicit, accept, or receive any rebate, concession, or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced. Every person or corporation who shall offer, grant, or give or solicit, accept or receive any such rebates, concession, or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one thousand dollars nor more than twenty thousand dollars. In all convictions occurring after the passage of this act for offenses under said acts to regulate commerce, whether committed before or after the passage of this act, or for offenses under this section, no penalty shall be imposed on the convicted party other than the fine prescribed by law, imprisonment wherever now prescribed as part of the penalty being hereby abolished. Every violation of this section shall be prosecuted in any court of the United States having jurisdiction of crimes within the district in which such violation was committed or through which the transportation may have been conducted; and whenever the offense is begun in one jurisdiction and completed in another it may be dealt with, inquired of, tried, determined, and punished in either jurisdiction in the same manner as if the offense had been actually and wholly committed therein.

"In construing and enforcing the provisions of this section the act, omission, or failure of any officer, agent or other person acting for or employed by any common carrier acting within the scope of his employment shall in every case be also deemed to be the act, omission, or failure of such carrier as well as that of the person. Whenever any carrier files with the Interstate Commerce Commission or publishes a particular rate under the provisions of the act to regulate commerce or acts amendatory thereto, or participates in any rates so filed or published, that rate as against such carrier, its officers, or agents in any prosecution begun under this act shall be conclusively deemed to be the legal rate, and any departure from such rate, or any offer to depart therefrom, shall be deemed to be an offense under this section of this act."

Section 2 of the Hepburn law amends the foregoing section of the Elkins law as follows:

" * * * It shall be unlawful for any person, persons or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereof whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereof, or whereby any other advantage is given or discrimination is practiced. Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebates, concession, or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one thousand dollars nor more than twenty thousand dollars: Provided, that any person, or any officer or director of any corporation subject to the provisions of this act, or the act to regulate commerce and the acts amendatory thereof, or any receiver, trustee, lessee, agent, or person acting for or employed by any such corporation, who shall be convicted as aforesaid, shall, in addition to the fine herein provided for, be liable to imprisonment in the penitentiary for a term of not exceeding two years, or both such fine and imprisonment, in the discretion of the court. Every violation of this section

shall be prosecuted in any court of the United States having jurisdiction of crimes within the district in which such violation was committed, or through which the transportation may have been conducted; and whenever the offense is begun in one jurisdiction and completed in another it may be dealt with, inquired of, tried, determined, and punished in either jurisdiction in the same manner as if the offense had been actually and wholly committed therein.

"In construing and enforcing the provisions of this section, the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier, or shipper, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or shipper as well as that of the person. Whenever any carrier files with the Interstate Commerce Commission or publishes a particular rate under the provisions of the act to regulate commerce or acts amendatory thereof, or participates in any rates so filed or published, that rate as against such carrier, its officers or agents, in any prosecution begun under this act shall be conclusively deemed to be the legal rate, and any departure from such rate, or any offer to depart therefrom, shall be deemed to be an offense under this section of this act."

It will thus be noticed that by the Hepburn law section 1 of the Elkins law was amended by inserting after the words "every person or corporation," in the clause declaring the parties guilty of a misdemeanor, the words "whether carrier or shipper," and also by inserting in said clause, after the words "who shall" the word "knowingly"; by striking out the clause providing that no penalty shall be imposed other than a fine, and inserting in lieu thereof the proviso, in substance, that any person, or any officer or director of any corporation subject to the provisions of the act, or any receiver, trustee, lessee, agent, or person acting for or employed by any such corporation, shall, in addition to the fine, be liable to imprisonment in the penitentiary for a term not exceeding two years, or both such fine and imprisonment, in the discretion of the court; and by inserting after the word "carrier," in the two instances in which said word appears in the second paragraph, the words "or shipper."

Section 10 of the Hepburn law, which I shall hereafter for the sake of brevity refer to as "section 10," reads as follows:

"Sec. 10. That all laws and parts of laws in conflict with the provisions of this act are hereby repealed, but the amendments herein provided for shall not affect causes now pending in courts of the United States, but such causes shall be prosecuted to a conclusion in the manner heretofore provided by law." 34 Stat. 595.

Section 4 of an act entitled "An act prescribing the form of the enacting and resolving clauses of acts and resolutions of Congress and rules for the construction thereof," approved February 25, 1871 (chapter 71, 16 Stat. 432; Rev. St. U. S. [2d Ed.] 1878, p. 2, c. 2, § 13; U. S. Comp. St. 1901, p. 6, § 13), which I shall hereafter refer to as "section 13," reads as follows:

"Sec. 13. The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."

The defendants here were indicted, after the passage and going into effect of the Hepburn law, for violations of the first section of the

Elkins law alleged to have been committed before the passage of the Hepburn law. The contention, as I understand it, is this: That by section 10 of the Hepburn law section 1 of the Elkins law was repealed, and that by inserting after the words of repeal in section 10 the clause, "but the amendments herein provided for shall not affect causes now pending in courts of the United States, but such causes shall be prosecuted to a conclusion in the manner heretofore provided by law," Congress by necessary implication evinced its clear intention to save only such criminal prosecutions under section 1 of the Elkins law as were then pending in the courts of the United States, and to release from prosecution all those who had violated that section, but against whom prosecutions were not then pending.

I do not think it necessary to consider the question so fully and elaborately discussed by counsel for the defendants in their briefs and at the oral argument, citing many cases, as to whether or not the first section of the Elkins law has been repealed and superseded by the Hepburn law. It was conceded on the argument by the counsel for the government that not only was the said section of the Elkins law expressly repealed by section 10 of the Hepburn law, by the words "that all laws and parts of laws in conflict with the provisions of this act are hereby repealed," but that, even in the absence of those words, it must be held to have been repealed under the rule laid down in the case of U. S. v. Tynen, 11 Wall. 88, 20 L. Ed. 153, wherein the court declares:

"When there are two acts on the same subject, the rule is to give effect to both, if possible; but, if the two are repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy, as a repeal of the first. And even where two acts are not in express terms repugnant, yet, if the latter act covers the whole subject-matter of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act."

The only question here to be considered is whether or not the clause after the repealing words in section 10 above set forth has the effect by necessary implication, when used in connection with said repealing words, notwithstanding the provision of section 13 above set forth, to release from criminal prosecution under the first section of the Elkins law those who had violated that law prior to the passage of the Hepburn law, but who had not been indicted prior to the passage of the Hepburn law.

Among the numerous cases cited by counsel I find only one which bears upon the exact question now under consideration, and that is the case of Lang et al. v. U. S., 133 Fed. 201, 66 C. C. A. 255. In the case of U. S. v. Hague (C. C.) 22 Fed. 706, it does not appear that section 13 was called to the attention of the court or was considered by the court. If it was, the decision is exactly contrary to that in U. S. v. Reisinger, 128 U. S. 398, 9 Sup. Ct. 99, 32 L. Ed. 480. In the latter case section 13 was considered by the Supreme Court of the United States, and they there held that the words "penalty," "liability," and "forfeiture," used in section 13, apply to crimes and the punishments therefor, and that that section abrogated the rule of the common law that the repeal of a statute operates as a remission of all penalties for

violation of it, committed before its repeal, and a release from prosecution therefor after said repeal, unless there be either a clause in the repealing statute, or a provision of some other statute, expressly authorizing such prosecution, and that that section contained such a provision. This case is not, I think, in point, except as above indicated, because of the difference in the language of the repealing sections there and here.

In the case of State v. Showers, 34 Kan. 269, 8 Pac. 474, cited with approval by Judge Jenkins in the Lang Case, and declared by him to be on all fours with that case, the Kansas statute then being considered, was as follows:

"Section 1. In the construction of the statutes of this state the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the Legislature, or repugnant to the context of the statute: First. The repeal of a statute does not revive a statute previously repealed. nor does such repeal affect any right which accrued, any duty imposed, any penalty incurred, nor any proceeding commenced under or by virtue of the statute repealed. The provisions of any statute, so far as they are the same as those of any prior statute, shall be construed as a continuation of such provisions, and not as a new enactment." Comp. Laws 1879, c. 104.

The repealing clause there being considered was as follows:

"Sec. 19. Original sections 2, 3, 4, 7, 8, 9, 12, 13 and 21 of the said act, to which this act is amendatory and supplemental, are hereby repealed. All prosecutions pending at the time of the taking effect of this act shall be continued the same as if this act had not been passed."

It will be noted that the words of the Kansas statutes above quoted are far from identical with those of the federal statutes now being considered. The Kansas statute of construction contains the words "unless such construction would be inconsistent with the manifest intent of the Legislature, or repugnant to the context of the statute," and thus leaves open to the courts the application of the recognized canons of construction to ascertain from the language of the repealing statute and the context of the statute the intent of the Legislature. There are no such words in section 13, and the Kansas statute does not provide, as does section 13, that the repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability under the repealed statute, unless the repealing act shall so expressly provide. Under the Kansas statute it was not necessary to expressly provide in the repealing act that a certain class of offenders shall be released from prosecution, but under the federal statute it is imperative that there should be such an express provision. The words "unless the repealing act shall so expressly provide" differentiates the two statutes, and in my opinion make the Kansas case of little, if any, value in determining the question now under consideration.

The case of Lang et al. v. U. S., supra, is, I think, on all fours with the one at bar, and is the only one in all the cases cited that bears on the exact question now being discussed. In that case section 3 of the act of March 3, 1875 (18 Stat. 477, c. 141 [U. S. Comp. St. 1901, p. 1286]), under which plaintiffs in error were indicted, was amended, repealed, and superseded by section 3 of the act of March

3, 1903 (32 Stat. 1214, c. 1012 [U. S. Comp. St. Supp. 1905, p. 276]). Section 28 of the latter act reads as follows:

"Sec. 28. That nothing contained in this act shall be construed to affect any prosecution or other proceeding, criminal or civil, begun under any existing act or any acts hereby amended, but such prosecutions and other proceedings, criminal or civil, shall proceed as if this act had not been passed." 32 Stat. 1220, c. 1012 [U. S. Comp. St. Supp. 1905, p. 268].

And the thirty-sixth section of the latter act was as follows:

"Sec. 36. That all acts and parts of acts inconsistent with this act are hereby repealed: Provided, that this act shall not be construed to repeal, alter, or amend existing laws relating to the immigration, or exclusion of, Chinese persons or persons of Chinese descent." 32 Stat. 1221, c. 1012 [U. S. Comp. St. Supp. 1905, p. 290].

The prosecution under review in that case was, as is the case here, commenced after the passage of the latter act, and was for an offense under the former act. The plaintiffs in error were sentenced to the penitentiary at hard labor, Lang for the period of three years, and Lewis for the period of two years, and each to pay a fine of $100 and costs of suit; and the petition in error was to reverse those judgments. The contention was the same there as here, and the judgments were affirmed. The judges sitting in the Court of Appeals, however, were divided, two of them, Judges Grosscup and Baker, concurring in the affirmance of the judgments, but on different grounds, and the other, Judge Jenkins, dissenting and differing with both of the other judges. Judge Grosscup based his opinion upon what his associate Judge Jenkins was pleased to term "a subtlety of grammar," holding that the word "begun" there used meant "which have already been begun or which may hereafter be begun." Thus construing the word "begun," it was not necessary for him to consider section 13, and he refers to it in his opinion only inferentially, if at all.

It is contended by counsel for the defendants here that the language used by Judge Grosscup indicated that, if he had found it necessary to consider section 13, he would have concurred with Judge Jenkins. To my mind some of that language would seem to indicate the contrary. Certainly it might have been said there, as is contended here, that the proviso contained in section 28 might have been left out altogether, because all prosecutions under the old law would have been saved by section 13. So that, I think, we may throw out of consideration the opinion of Judge Grosscup as not in any way enlightening us upon the question here under consideration. As I have heretofore said, Judge Jenkins cited the case of State v. Showers, supra, and declares that it is on all fours with the case then being considered. The learned judge holds that the word "begun," there used, meant "already begun." He quotes section 13, and then he pursues exactly the same argument as that made by counsel for the defendants in the case at bar. I quote a portion of what he says:

"This [referring to section 13] without doubt prescribes a rule of construction to be applied to every subsequent act, in the absence of an expression of a different intent in such subsequent act. U. S. v. Reisinger, 128 U. S. 398, 9 Sup. Ct. 99, 32 L. Ed. 480. But as one Legislature cannot bind a subsequent Legislature to a particular mode of repeal, where the subsequent act contains a

provision with reference to a prior act superseded by the new act, we must apply the recognized canons of construction to the language employed to ascertain the intent of the Congress. * * * We are compelled to assume that the Congress understood this. We are compelled to assume that they spoke to a purpose. The natural import of the language used, as with deference I think, can bear no other construction than that the Congress intended to say what it expressly said should be saved, and nothing else. It is not permitted to the court to say that the Congress spoke unadvisedly or unwisely, nor should violence be done to recognized rules of construction to avoid supposed mischievous results, or supposed careless legislation. 'Ita lex scripta est.' The law has so spoken. The courts should follow and obey. If injury results the responsibility is upon the Legislature, not upon the court."

In this language, as with deference I think, he in effect adds to that section, and to section 28 of the act there being considered, words which they do not contain, and avoids and begs the whole question. If we should follow his reasoning, we would, by an application of the rule of construction which Congress has by section 13, as to the matter now under consideration, to wit, releases from prosecution, forbidden to the courts, add to that section and to section 10, by implication from words which they do contain, words which they do not contain. It seems to me, as to releases from prosecution, that it may be said of section 10: "Ita lex non scripta est." The law is not so written. And that it may be said of section 13: "Ita lex scripta est." The law is so written. The courts should follow and obey. And, if they fail to follow and obey, the responsibility is on the courts, and not on the Legislature.

Black's Law Dictionary defines the word "express" as follows:

"Made known distinctly and explicitly, and not left to inference or implication; declared in terms; set forth in words; manifested by direct and appropriate language, as distinguished from that which is inferred from conduct. The word is usually contrasted with 'implied.' "

Bouvier's definition of the word "express" is as follows:

"Stated or declared, as opposed to implied. That which is made known and not left to implication. It is a rule that, when a matter or thing is expressed, it ceases to be implied by law. 'Expressum facit cessare tacitum.' "

The American & English Encyclopedia of Law says:

" 'Express' is defined as directly stated; not implied or left to inference; distinctly and pointedly given; made unambiguous by special intention; clear; plain."

Webster's Dictionary defines the word "express" as follows:

"Directly stated; not implied or left to inference."

Worcester defines the word "express" as follows:

"Given in direct terms; not implied; not dubious; clear; definite; explicit; plain; manifest."

The Century Dictionary defines the word "express" as follows:

"Clearly made known; distinctly expressed or indicated; unambiguous; explicit; direct; plain. In law, commonly used in contradistinction to 'implied.' "

Section 13 is, I think, as declared by Judge Deady, in the case of U. S. v. Barr, 24 Fed. Cas. 1016, a wise and salutary provision. The learned judge says:

"Section 13 is a salutary provision, and if it, or something like it, had always been incorporated in the statutes of the states or United States, it would have prevented many a lame and impotent conclusion in criminal cases in which the defendant escaped punishment because the Legislature, in the hurry and confusion of amending and enacting statues, had forgotten to insert a clause to save offenses and liabilities already committed or incurred from the effect of express or implied repeals."

It seems to me that it is wide of the mark to say that one Legislature cannot tie the hands of subsequent Legislatures. It is more to the purpose to say that the Legislature can bind the hands of the courts as to rules of construction. Section 13, to my mind, evinces no attempt on the part of the Congress of 1871 to bind the hands of subsequent Congresses. If that argument were pursued to its ultimate conclusion, it would mean that section 13 would only apply to the acts of the Congress that passed it, and that, whenever any subsequent Congress in express terms repealed a penal statute, it by that means did away with section 13, and clearly evinced an intention that section 13 should not apply thereto. In the Reisinger Case the Supreme Court of the United States holds exactly the contrary of this. The title of the act in which section 13 was enacted (which I have heretofore given) shows clearly and beyond doubt the purpose of that section, and that it was to prescribe a rule of construction to the courts, and not an attempt to tie the hands of future Congresses. By section 13 Congress, in words so plain that they do not need any construction, says to the courts, as it has a right to say: "When we repeal a penal statute, you shall not release those who have violated the act repealed from punishments for violations thereof, unless the repealing act so expressly provides. Unless we say expressly, not by implication, that such persons shall be released, you shall treat the repealed statute as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement thereof. If we do not say so expressly—that is, in so many words—you shall not, by applying the accepted or common-law rules of construction. imply that we have intended to release such persons. If we intend to do that, we will say so in express terms."

If this be true, the ancient maxim or rule of construction, "Expressio unius est exclusio alterius," cannot be invoked here. Section 13 was a general provision of law addressed to the courts. It became a part of the general body of the law. It has been so treated ever since its passage. It was carried into the Revised Statutes of the United States of 1878, and into the United States Compiled Statutes of 1901. It is a part of the general body of the statutes of the United States now. As I have said, it was not intended to bind the hands of subsequent Congresses, and could not bind them. But every subsequent Congress that has not repealed it has recognized it as a part of the general body of the law and as a rule of construction to be applied by the courts to acts passed by it, as much as if it had ben re-enacted by such Congress. The Congress of 1906 so recognized it. They knew that in the hurry

and confusion of amending and enacting statutes, in the pressure upon members of Congress, not only by reason of their having to consider all the various matters of legislation for a great nation, but also by reason of the exactions upon their time and attention as to many things not really pertaining to their legislative duties (and of this few who have not themselves been members of Congress can have any adequate appreciation), words and phrases might inadvertently, or by mistake, or possibly by design of those in and out of Congress having an interest in the particular matter legislated upon, find their way into acts repealing penal statutes which might by the application of the accepted and common-law rules of construction release from penalty those who had violated repealed acts; and it was for this reason they originally passed and have ever since recognized and kept upon the statute books section 13 as a part of the general body of the law binding upon the courts. They showed their wisdom in recognizing that they might make mistakes, or be careless or inadvertent, and thus produce mischievous results. And this section 13 was placed by them, and has ever since its enactment been kept by them, as a sentinel on guard to prevent such mischievous results. They said to the courts, as plainly as words could say: "You shall not, by implying from words that we do use words that we do not use, remove that sentinel." They said, as plainly as they could say, to the courts: "When you come to a repealing statute of. this kind, you need not—indeed, you shall not—use those keys you have been accustomed to use to unlock the doors of our minds and ascertain our intention as to the release from penalty of those who have violated a repealed law. It will not be necessary for you to consider the niceties of grammatical construction as to whether a word is in the preterit or past tense, a participle, a connective, or a verbal adjective, in order to ascertain whether or not we intend to release violators of the repealed law. If we wish or intend to release such violators, we will say so in express words, and not leave it to be implied or inferred. If we insert clauses which we might have left out, or which we should have left out, you shall not from that infer that we intended to put in clauses that we did not put in, and thus release violators of the law."

In other words, all that is left to the courts is to say whether or not they find in the repealing act an express provision releasing offenders, or any class of offenders from prosecution under the repealed act. If no such express provision is found they are not released. I do not find any such provision in the repealing act now under consideration.

Judge Baker bases his opinion squarely upon section 13. In his opinion the result would be the same if the word "begun" meant only "already begun," as held by Judge Jenkins. Concurring fully, as I do, in his opinion, I quote it, because it is perhaps expressed in better language than I have myself been able to command. He says:

"Of course, one legislative body cannot tie the hands of its successors with respect to either subject-matter or method of subsequent legislation. But section 13, as I view it, evinces no such attempt. The Congress of 1871 was not addressing itself particularly to succeeding Congresses, but particularly to the courts. The courts are commanded by section 13 to treat a repealed

statute as still remaining in force for punishment of violations thereof, unless the court shall find that the repealing act 'expressly provides' that such repealed act shall not sustain any prosecution for its violation. The case of U. S. v. Reisinger, 128 U. S. 398, 9 Sup. Ct. 99, 32 L. Ed. 480, readily distinguishable from the present case in its facts, is useful here only as showing the Supreme Court's recognition (1) of what the common-law rule of construction was; (2) of the right of Congress to legislate upon the subject-matter of rules of construction; and (3) of the fact that Congress by the enactment of section 13 abrogated the common-law canon of interpretation, hereinabove stated, respecting the effect of a repeal. If section 13 is in force in its entirety, it is the court's duty to apply the rule of interpretation therein laid down, and to treat the penal statute of 1875 as being alive for the purpose of sustaining every proper prosecution for the enforcement of its penalties, unless the amendatory and enlarging act of 1903 be found to contain an express provision for the forgiveness of the unconvicted. There is no pretense that the act of 1903 expressly so provides. If section 13 is in force in its entirety an argument along this line: The act of 1875 was superseded by the act of 1903. The effect of the supersession was to exempt all unconvicted violators of the act of 1875 from punishment, unless Congress has provided for their prosecution. Congress in the act of 1903 has only provided that unconvicted violators against whom prosecutions were begun before March 3, 1903, may be punished. Therefore unconvicted violators against whom prosecutions were begun after March 3, 1903, shall go free—is false, I think, because its keynote is the abrogated common-law rule of construction."

The contention, if it is so contended, that section 13 was partially repealed, by implication, by section 10, but only in so far as it related to prosecutions under the Elkins law of those who had not already been indicted, is, I think, fully met by what I have already said, and by Judge Baker, where he says:

"Has section 13 been repealed in whole or in part? That section furnished a complete enactment respecting one method of interpretation. Subsequent Congresses were left at liberty to legislate on that subject, as on every other within their constitutional right, and in any manner they might choose. They could amend or repeal the previous legislation. They could repeal it expressly or by implication, in whole or in part. No claim is made of an express repeal. No claim is made of a general repeal by implication. An argument is advanced, as I understand it, that section 13 has been partially repealed by implication (but only in its relation to the penal acts of 1875 and 1903), in this way: Section 13, in its application to the acts in question, provides that unconvicted violators of the act of 1875 against whom prosecutions were begun before March 3, 1903, may be punished, and also that unconvicted violators of the act of 1875 against whom prosecutions were begun since March 3, 1903, may be punished. The act of 1903 provides that unconvicted violators of the act of 1875 against whom prosecutions were begun before March 3, 1903, may be punished, but is silent respecting the fate of those unconvicted violators of the act of 1875 against whom prosecutions had not been begun by March 3, 1903. Therefore that part of the general law embodied in section 13 which by its terms would be applicable to the unconvicted violators of the act of 1875 against whom indictments were returned after March 3, 1903, has been impliedly repealed. And the maxim, 'Expressio unius est exclusio alterius,' is evoked as clinching the argument. It strikes me as a queer doctrine that silence should accomplish a repeal. It seems to me that, instead of adverting to the maxim quoted, which may properly be applied where one must choose between alternatives, attention should be given to those principles which declare that repeals by implication are not favored, that new legislation does not supersede the old by implication unless the new covers the whole subject of the old, and that the new may reaffirm (though reaffirmation is a needless work), amend, or supplant parts of the old without affecting the force and validity of those parts concerning which the new is silent."

I can only add that it seems to me queer that Congress should intend to accomplish such a repeal in such a manner. It is equivalent to saying that, although this rule of construction contained in section 13, and addressed to the courts, directs that the repeal of a statute shall not have the effect to release from prosecution unless the repealing act shall so expressly provide, still the courts can, although there is no such express provision in the repealing act, avoid that rule and accomplish what it was intended to prevent by construing by implication that rule out of existence. It is equivalent to saying that, if we cannot avoid the rule by implication or inference from the language contained in the repealing act, we can by implication or inference from that language get rid of the rule. It is equivalent to saying that, although Congress has placed this sentinel on guard to prevent just such releases, the courts can use the key therein forbidden to be used to knock down and put out of the way the sentinel. This, as with deference, I think, would be little less than a kind of judicial legerdemain. I cannot think that the courts can thus obviate a plain, positive, and unambiguous statute prescribing a. rule of construction. Besides, I think that the contention is fully met by the Supreme Court of the United States in the case of Rosecrans v. U. S., 165 U. S. 257, 17 Sup. Ct. 302, 41 L. Ed. 708, wherein the court says:

"Where Congress has expressly legislated in respect to a given matter, that express legislation must control in the absence of subsequent legislation equally express, and is not overthrown by any mere inferences or implications to be found in such subsequent legislation."

I have not been impressed by the argument drawn from the history of the legislation in reference to rates, rebates, and concessions. In that argument it was asserted that those laws were an evolution and that the Hepburn law was the final result of that evolution. It was asserted that the laws prior to the Hepburn law had been permitted to remain a dead letter upon the statute book. It was asserted that the Elkins law was a harsh and stringent law, subjecting those who had given or accepted rebates or concessions, not knowing that they were giving or accepting such rebates or concessions, to its penalties, and that Congress, recognizing this, amended and superseded that law by the Hepburn law; that by inserting the word "knowingly" in the Hepburn law it evinced its recognition of the harshness of the Elkins law; and that this throws light upon the repealing section of the Hepburn law, and strengthens the contention that it was the intention of Congress to release from prosecution under the former law those against whom prosecutions had not already been begun. In answer to this it might be said that it may well be questioned whether those laws had been permitted to remain a dead letter, but that, on the contrary, numerous efforts had been made and were being made to enforce them; and it might also be said that Congress did not recognize the harshness of the Elkins law by inserting in the amendment thereto the word "knowingly," but inserted that word for another and a very good reason. The punishment prescribed by the Hepburn law, amending and superseding it, is fine or imprisonment in the penitentiary for a term not exceeding two years, or both such fine and im-

prisonment, in the discretion of the court. Does it not strike one with much greater force that the word "knowingly" was inserted because the offense had thus been made an infamous one? In view of what I have already said, if I am correct in the conclusion reached, this argument is without force, because it proceeds upon the assumption that we may by interpretation or inference ascertain the intention of Congress in reference to the release from prosecution of those who had violated the repealed law.

But if we were permitted, in the face of section 13, to ascertain the intention of Congress by interpretation or inference, and for that purpose could look, if necessary, to the history of the legislation and of the times in which it was passed, as in that case I think we could (U. S. v. Union Pac. R. R. Co., 91 U. S. 72, 23 L. Ed. 224), it might be well for us, while we are considering, in the light of that history, what Congress intended to do, also to consider, in the light of that history, what Congress did not intend to do. I think that to any one at all familiar with that history it is well known that Congress at the time of the passage of the Hepburn law was seeking to enlarge and make more effective the powers of the Interstate Commerce Commission, and was seeking, not to make the laws in reference to rates and rebates and concessions less stringent, but more stringent, and was seeking, above all things, to prevent the Interstate Commerce Commission from being sheared of its powers, and the objects of the law nullified, by proceedings in court and the necessary delays incident thereto. I think that to any one at all familiar with the condition of the public mind or with the temper of Congress at that time it must be evident that Congress did not wish to release any one from the penalties of the laws theretofore in force, but, on the contrary, intended that all offenders against those laws should be prosecuted, and that no guilty person or corporation should escape. And I can conceive of no reason why Congress should wish or intend that those whose violations had been discovered and against whom prosecutions had already been commenced, even though they might be few in number, should be prosecuted to a conclusion and should suffer the penalties incurred, and that that much larger class of offenders, whose violations of the law had not been discovered and against whom prosecutions had not been begun, should be allowed to go free.

But, even if we are permitted, in the face of section 13, as to releases from prosecution by a repealing act, to ascertain by interpretation or inference the intention of Congress, we can, by following and applying an accepted rule of construction, as binding as that contained in the maxim, "Expressio unius est exclusio alterius," ascertain the intention of Congress and reconcile section 10 and section 13, and make them both stand together. Sections 15 and 16 of the interstate commerce act (24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), as the same had been amended prior to the passage of the Hepburn act, prescribe the mode of procedure before the Interstate Commerce Commission and in the courts to enforce the provisions of that law. By the Hepburn act these sections are amended and superseded. It is contended by counsel for the government that the amendments to these sections refer only to civil procedure, and by counsel for the defendants that

151 F.—7

they refer in express terms to both civil and criminal procedure. But I think the result is the same if they refer to either or both. By a comparison of the provisions of the Hepburn act amending and superseding these sections of the former law, it is found that changes are made in the procedure therein provided for. Without following through every detail the amendments made in these sections by the Hepburn law, it will be sufficient to refer to only one.

The expediting act of February 11, 1903 (32 Stat. 823, c. 544 [U. S. Comp. St. Supp. 1905, p. 622]), entitled "An act to expedite the hearing and determination of suits in equity, and so forth," applied only to causes wherein the United States is complainant. By the Hepburn act its provisions are made applicable to all suits, no matter who is complainant, brought in any of the Circuit Courts of the United States against the Interstate Commerce Commission to enjoin, set aside, annul, or suspend any order or requirement of the commission, including the hearing on an application for a preliminary injunction, and are also made applicable to any proceeding in equity to enforce any order or requirement of the commission, or any of the provisions of the act to regulate commerce, approved February 4, 1887, and all acts amendatory thereof or supplemental thereto.

It is admitted by both sides—and, indeed, it is stated by counsel for the defendants to be the A B C of the law—that it is competent for Congress to make changes in the mode of procedure, and that the changes thus made would be applicable to and govern the procedure in all causes pending as well as in those thereafter commenced. This being the case, the amendments to the mode of procedure made by the Hepburn law would affect causes pending at the time of its passage as well as those thereafter brought. So that, if Congress wished, as to causes then pending, to continue in force the former provisions in reference to the procedure, it was necessary that they should make provision therefor. This, I think, furnishes us a key by which we can ascertain the intention of Congress when they inserted the words, "but the amendments herein provided for shall not affect causes now pending in courts of the United States, but such causes shall be prosecuted to a conclusion in the manner heretofore provided by law," and it gives us a complete answer to the contention that, unless those words are construed as counsel for the defendants would have us construe them they are wholly meaningless and superfluous. Let us read section 10, in which these words occur, in connection with section 13, as the Supreme Court of the United States did in the Reisinger Case. The two, thus read together, would be as follows:

"That all laws and parts of laws in conflict with the provisions of this act are hereby repealed: Provided, that said repeal shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred thereunder, unless this act shall so expressly provide, and the same shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability; but the amendments herein provided for shall not affect causes now pending in courts of the United States, but such causes shall be prosecuted to a conclusion in the manner heretofore provided by law."

And let us remember always in this connection that it is the intention of Congress to release from prosecution that we are considering.

It would seem to me that, thus read, no one could construe that by this section Congress intended to release any offenders against the former laws from prosecution. But, if these statutes are repugnant, as it seems to me, when so read together, they are not, it is a familiar rule that seemingly repugnant statutes must be so construed, if possible, as that both shall stand. "Repeals by implication are not favored, and will not be decreed, unless it is manifest that the Legislature so intended. As laws are presumed to be passed with deliberation and with full knowledge of all existing ones on the subject, it is but reasonable to conclude that in passing a statute it was not intended to interfere with or abrogate any former law relating to the same matter, unless the repugnancy between the two is not only irreconcilable, but also clear and convincing, and following necessarily from the language used, unless the later act fully embraces the subject-matter of the earlier, or unless the reason for the earlier act is beyond peradventure removed. Hence, every effort must be used to make all acts stand, and if, by any reasonable construction, they can be reconciled, the later act will not operate as a repeal of the earlier." Am. & Eng. Ency. of Law [Old Ed.] vol. 23, p. 489.

Bringing these two sections together, as I have done, and reading them together, in view of the foregoing rule, can they be reconciled and both be made to stand? Let us not forget or leave out the words, "but such causes shall be prosecuted to a conclusion in the manner heretofore provided by law." The words "in the manner" show to my mind conclusively that this last clause relates only to the mode or method of procedure. Let us read this clause in connection with the words, "the amendments herein provided for shall not affect causes now pending." Shall not affect them how? Certainly, in the face of section 13 and in connection with the words "in the manner," as to that only as to which they could affect them, namely, the procedure. And what amendments are referred to? Clearly none other than the amendments relating to the procedure. If we are to attribute to Congress the wisdom and learning attributed to them in the argument, they knew that where the procedure was changed all actions, civil or criminal, whether then pending or thereafter brought, would thereafter follow the new procedure. "Even where prosecutions and rights of action under a repealed enactment are preserved by a saving clause in the repealing act, yet, after the latter takes effect, they must be carried on and enforced in conformity with the provisions of the repealing statute, the one repealed being preserved only to the extent of furnishing the right of action or prosecution, not the practice or mode of procedure." Endlich on the Interpretation of Statutes, 487. And, if as to actions then pending, they wished that the former provisions as to the procedure should remain in force, as I have said above, it was necessary that they should insert these words in section 10 after the repealing words. And it seems to me that, using this language which points directly to the mode of procedure, they could have intended nothing else. It seems to me that, not only may the two sections be thus clearly harmonized and made to stand together, but that they must be thus harmonized, and that the intention of Congress is thus made clear. And I think the interpretation that Congress intended by these words to release any class

of offenders against the former laws from penalty, forfeiture, or liability is a forced and perverted one.

In the foregoing I have assumed that changes have been made by the Hepburn law in the mode of procedure, not only in civil causes, but also in criminal causes, as is contended by counsel for the defendants. I think, however, there is much force in the contention of counsel for the government that the words "causes now pending" were intended by Congress to refer only to civil causes. Counsel for the defendants have pointed out to me provisions in the Hepburn law making certain things criminal which had not theretofore been criminal and changing the penalties for crimes under the former laws; but these do not touch the procedure in the prosecution of such crimes, and, indeed, it is difficult to see, as counsel for the government contends, how such procedure could have been changed. Admitting, as I think we must admit, that the word "causes" is broad enough to include both civil and criminal causes, yet, under the rule above given in relation to reconciling seemingly repugnant statutes, if a word of broad meaning is used, but if by giving to it a narrower meaning we can reconcile the seemingly repugnant provisions, and especially if the context shows, by reasonable interpretation, that the narrower meaning was intended, it should be construed as having that narrower meaning. If we give to this word this narrower meaning, the foregoing observations apply with equal, or even greater, force.

I am, therefore, clearly of the opinion that the demurrers should be overruled.

## Memorandum.

It is proper to state that my associate, Judge LOCHREN, who sat with me at the hearing of these demurrers, but who takes no part in this decision, does not concur in the views expressed in the opinion herewith filed. His view is as follows:

"That section 13 of the Revised Statutes gives a rule of construction only applicable to such repealing statutes as have no express saving clause, indicating that such matter was in the mind of Congress when it passed the repealing act, and therefore was not one of the matters then expressly acted upon. Section 10 of the Hepburn act expressly repeals the parts of the Elkins act on which these indictments rest, and also contains an express saving clause covering only pending cases. Thus Congress in the Hepburn act expressly provided just what penalties, forfeitures, and liabilities should not be extinguished by the repeal, and equally by the force of the express language used extinguished others. It does this by the express language of the repeal, without resorting to the maxim, 'Expressio unius est exclusio alterius;' and it therefore does expressly provide that the effect of the repeal shall be different from what it would have been, were there no express saving clause, and the matter left to the construction required by section 13. It therefore matters not whether the saving clause thus expressed covers only civil causes, or causes which are both criminal and civil."